# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

**UNITED STATES OF AMERICA**

**v.**                                                   **1:06-CR-070**
                                                             **(GLS)**

**LINDA ADELINE MALENGE,**[1]

                          **Defendant.**

---

**APPEARANCES:**                          **OF COUNSEL:**

**FOR THE UNITED STATES:**

HON. GLENN T. SUDDABY              EDWARD P. GROGAN
United States Attorney                  Assistant U.S. Attorney
445 Broadway
218 James T. Foley U.S. Courthouse
Albany, New York 12207-2924

**FOR THE DEFENDANT:**

HON. ALEX BUNIN                       GENE V. PRIMOMO
Federal Public Defender                Assistant Federal Defender
39 North Pearl Street, 5th Floor
Albany, New York 12207

**Gary L. Sharpe**
**U.S. District Judge**

## Decision and Order

---

[1]This appears to be the defendant's true name. *See Malenge Decl., Dkt. No. 28*; *see also Gov't Memo.* n. 1*, Dkt. No. 32*.  No motion to amend the indictment has been made, *see* FED. R. CRIM. P. 7(e), and the current caption identifies the defendant as "Jane Doe, a/k/a, Lyndia-Adeline Malenge, a/k/a, Hadjira Merazi, a/k/a, Adeline Annastasia."

## I. **Introduction**

Linda Adeline Malenge has been indicted for false personation, misuse of a passport, and false use of a passport.  *See Indictment*, *Dkt. No. 6*; *see also* 18 U.S.C. §§ 1546(a), 1544 and 1543.  She moved to dismiss the indictment, and the government opposed.  *See Malenge Mot., Dkt. No. 20; Govt. Resp., Dkt. No. 21*.  During oral argument, the court alerted the parties that their submissions were flawed because they offered no reliable means to ascertain facts that were essential to the resolution of the motion.  *See 7/21/06 Minute Entry*, *Dkt. No. 24*.  Thereafter, both parties supplemented the record.  *See Dkt. Nos. 28, 32*.

Malenge argues that the indictment must be dismissed because her Fifth and Fourteenth Amendment Due Process rights were violated when the government elected to prosecute her.  Her conclusion rests on the following postulates.  As a signatory to the Treaty on Refugees, the United States must comply with Treaty obligations regarding those seeking asylum in America.  Those obligations require signatories to decline criminal prosecution of refugees who use false documents to gain entry.  The United States Attorney is a component of the Executive Branch, and his authority to prosecute is limited by the requirement that he obey treaty

2

obligations.  When Malenge entered the United States, she presented false documents but was seeking political asylum.  Thus, the United States Attorney's decision to prosecute exceeds his authority and violates Malenge's Due Process rights.

At first blush, Malenge's argument invites a legal excursion seeking to ascertain the parameters of executive power, international obligations and constitutional law.  However, such an excursion is unnecessary because as a matter of fact, there was no violation of treaty obligations or other substantive provisions of U.S. immigration law.  Accordingly, the motion to dismiss is denied.

## II.   **Facts**

The facts are now sufficiently developed so that the court can resolve the motion without a hearing.[2]  *See* United Nations High Commissioner for Refugees ("UNHCR") Advisory Opinion (Mar. 18, 2003), *Dkt. No. 20*, pt. 3; UNHCR Memo., *Dkt. No. 20*, pt. 4; UNHCR List of Signatories to the 1951 Convention relating to the Status of Refugees and the 1967 Protocol, *Dkt. No. 20*, pt. 5; Dep't of Homeland Security Investigative Report, *Dkt. No. 24*,

---

[2]Stated otherwise, the court recognizes that the factual recitation which follows has not withstood the scrutiny of cross-examination.  Nonetheless, the court presumes accuracy for purposes of the motion.

Def. Ex. 1; N.Y. Times Article on the Congo (June 23, 2006), *Dkt. No. 22*,

pt. 2; *Malenge Decl.*, *Dkt. No. 28*, pt. 2; Dep't of Homeland Security

Investigative Report, *Dkt. No. 32*, pt. 2; Advice of Rights & Interview Log

(Mar. 26, 2006), *Dkt. No. 32*, pt. 3; Dep't of Homeland Security Form, *Dkt.

No. 32*, pt. 4.

On February 26, 2006, Malenge boarded an Amtrack train in

Montreal that was destined for New York City.  At 12:15 P.M., the train was

stopped at Rouses Point, a U.S.-Canadian port of entry.  U.S. Customs

and Border Protection agents boarded to inspect the passengers.

During primary or initial inspection, Agent Bourque confronted

Malenge and asked her for identification.  She presented a Canadian

passport identifying herself as Algerian-born "Hadjira Merazi."  In French,

she explained to Bourque that she was a Canadian citizen living in

Montreal.  Given his training and experience, Bourque knew that she was

not born in Algeria.  Upon a closer inspection of her passport, he believed it

had been altered by substituting a different photograph.  When Malenge

was unable to provide other identification, Bourque referred her to

secondary inspection.

At secondary inspection, Bourque further questioned Malenge about

4

her residence, her destination and the length of her stay in Canada.  He

reinspected the passport and believed that the date of birth and issue date

had been altered.  He then removed Malenge from the train and took her to

the Champlain Port of Entry for further inspection.

There, and in response to questioning, Malenge insisted that she was

"Hadjira Merazi."  When Bourque asked her to spell the name, she

misspelled it.  Two other agents then frisked Malenge and discovered a

Greek passport hidden in a soft cast on her leg.  The Greek passport

identified her as "Adeline Annastasia," born in Kinshasa.  After she was

fingerprinted and a system check proved negative, she was asked to write

her real name.  At that point, she identified herself as Lynda-Adeline

Malenge, a citizen of the Congo.

During further questioning, Malenge told the agents that she entered

Canada four months earlier on October 24, 2005 using the Greek passport.

Once in Canada, a friend gave her the bogus Canadian passport to assist

her unlawful entry into the United States.  She was destined for Bridgeport,

Connecticut to join her refugee husband, Nono Malenge.

After these admissions, Malenge was turned over to Customs and

Border Patrol Officer Brault who was responsible for initiating prosecution.

Through an interpreter, Brault advised Malenge of her *Miranda* warnings at 5:00 P.M, and she requested the assistance of counsel.  All questioning then ceased.  Brault then asked Malenge to complete a Customs and Border Protection Form used to elicit post-arrest pedigree information, and Malenge complied.  After confirming with the U.S. Attorney's office that Malenge would be prosecuted, Brault produced her before a Magistrate Judge for an initial appearance.  The Magistrate Judge remanded Malenge to the custody of the U.S. Marshals.

Shortly thereafter, Brault returned to Champlain and reviewed the pedigree Form.  Upon review, he saw that Malenge had written "yes" in response to the following question: "Do you want refugee/asylum status in the United States."  *See* Dep't Homeland Security Form, *Dkt. No. 32*, pt. 4. From her initial confrontation on the train at 12:15 P.M. until interrogation ceased at 5:00 P.M., Malenge never stated that she was a refugee seeking asylum.

According to Malenge, she was born on August 6, 1982 in the Democratic Republic of the Congo.  She has resided there her entire life, and she is a Congolese citizen.  In 2000, she married Nono Malenge who is also a Congolese native.  In summary, she fears persecution in the

6

Congo for the following reasons: (1) the Congo is violent, unstable and undemocratic; (2) in 2004, her father was accused of associating with a guerilla faction opposing the government, and he was murdered; (3) her brother is since missing and presumed murdered; (4) her husband's family was associated with the former President of the Congo who was murdered, and the family remains vocally opposed to the current regime; and (5) she suffered an ankle fracture when she was violently assaulted in her home on October 15, 2005, by government forces looking for her uncle.

As a result of the October 15 assault, she fled the Congo eight days later on October 23.  She traveled to Paris, France with a family friend who obtained the false Greek passport for her.  Ultimately, she intended to reunite with her husband, an asylum seeker residing in Bridgeport, Connecticut.  She first flew to Montreal and remained in a "safe house" for five days.  She then moved to Toronto because she was told it would be easier to gain entrance into the United States from there.  While in Toronto, she stayed with a sympathetic Haitian family for two months.  There, she obtained the bogus Canadian passport.

On February 26 at 9:50 A.M., she boarded a train in Montreal, first filling out a Canadian travel form indicating her destination as Bridgeport.

After that, her account of events substantially parrots that of the agents. *See Malenge Decl.*, *Dkt. No. 28,* pt. 2.  Additionally, she avers that when she eventually provided her true name, she told the officers that she was in danger in the Congo.

### III.  Analysis

To simplify resolution of Malenge's motion, the court accepts the following principles at face value.  In 1968, the United States undertook refugee obligations when it signed the 1967 Protocol mandating compliance with Articles 2 through 34 of the United Nations Convention Relating to the Status of Refugees.  *See* Protocol Relating to the Status of Refugees ("Protocol"), Nov. 1, 1968, 19 U.S.T. 6223; United Nations Convention Relating to the Status of Refugees ("Refugee Treaty"), June 28, 1951, 19 U.S.T. 6259, T.I.A.S. No. 6577; *see also Garcia v. I.N.S.*, 7 F.3d 1320, 1324 n. 3 (7th Cir. 1993) (explaining the relationship between the Protocol and Treaty and the nomenclature routinely employed by the courts).  Both the Executive Branch and Congress believed that U.S. immigration law fully complied with the Treaty when it was adopted.  *See generally*, *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993); *I.N.S. v. Cadoza-Fonseca*, 480 U.S. 421 (1987); *I.N.S. v. Stevic*, 467 U.S. 407

(1984).  Under the Constitution, the President has the power to make

treaties with the consent of the Senate, and state and federal governments

are obligated to enforce rights recognized by the self-executing provisions

of such treaties.  *See Sanchez-Llamas v. Or.*, 126 S.Ct. 2669, 2679-80

(2006).  The Attorney General and U.S. Attorneys retain broad discretion to

enforce the nation's criminal laws, including the decision whether to

prosecute, and what charges to file or present to a grand jury.  *See U.S. v.

Armstrong*, 517 U.S. 456, 464 (1996).  However, prosecutorial discretion is

sometimes subject to constitutional constraints.  *See id.*  Thus, for

example, due process is violated when a prosecutor selectively prosecutes

for impermissible reasons, including the fact that those prosecuted are

engaged in protected statutory or constitutional conduct.  *See, e.g., Wayte

v. U.S.*, 470 U.S. 598, 607-08 (1985); *Bordenkircher v. Hayes*, 434 U.S.

357, 363 (1978); *U.S. v. Al Jibori*, 90 F.3d 22, 25 (2d Cir. 1996) (false

passport prosecution).

With these principles in mind, the court turns to the central tenet of

Malenge's argument, namely, whether the government's decision to

prosecute her impinges on asylum rights afforded her under the Refugee

Treaty.  She claims that since she was a refugee seeking asylum, the

9

Refugee Treaty precludes the government from prosecuting her for misuse and false use of a passport (counts two and three) or for any other offense until an asylum application is decided. *See Malenge Memo. at 1-2, Dkt. No. 20,* pt. 2 (citing Article 31(1) of the Refugee Treaty). Therefore, she argues, the government's decision to prosecute violates her due process rights, and the indictment must be dismissed. Given the circumstances extant at the time of Malenge's arrest, neither the Treaty nor U.S. asylum law afforded her rights that were violated by the government's decision to prosecute.

U.S. immigration law includes the statutory provisions found in Title 8 U.S.C. §§ 1101, *et. seq.*, and all "laws, conventions, and *treaties*...relating to the immigration, exclusion, deportation, expulsion, or removal of aliens." 8 U.S.C. § 1101(17) (emphasis added). Thus, immigration law includes the Treaty on Refugees, but that Treaty does not impose the obligations that Malenge suggests. Article 31(1) of the Refugee Treaty specifically provides:

> Refugees unlawfully in the Country of Refuge.
>
> 1.  The Contracting States shall not impose penalties, on account of their illegal entry or presence, on refugees who, coming directly from a

> territory where their life or freedom was threatened
> in the sense of article 1, enter or are present in their
> territory without authorization, provided they present
> themselves without delay to the authorities and
> show good cause for their illegal entry or presence.

Refugee Treaty art. 31, Nov. 1, 1968, 19 U.S.T. 6223.  Inversely

paraphrased, contracting states are free to prosecute when refugees

illegally enter either from a country in which they have settled following

their exodus from the country of persecution, or when they fail to

immediately notify authorities that they are seeking asylum and explain

their illicit entry.  Nothing in the Treaty itself precludes prosecution for the

use of false documents, including passports.  As the facts reflect, Malenge

did not immediately notify authorities that she was seeking asylum and

arguably, she had settled in Canada before attempting entry into the United

States.

Although the actual Treaty language does not support Malenge's

argument, she nonetheless cites a UNHCR advisory opinion and

memorandum interpreting that language as further support for her position.

*See Malenge Memo., Dkt. No. 20,* pt. 2 nn. 1-3 (citing UNHCR Advisory

Opinion and UNCHR Memo., *Dkt. No. 20*, pts. 3 & 4).  First of all, the 2003

Advisory Opinion was prepared by someone identified as a Protection

11

Officer for an immigrant advocacy center located in Florida.  In other words,

it was not specifically prepared for this court and this litigation.  Secondly,

the opinion is not inconsistent with the language of the Treaty because it

advocates that a host country exercise prosecution restraint, not

preclusion, when it is aware that someone is seeking asylum.  *See id.*

Even so, "awareness" is a precondition of restraint, and there was no

awareness in this case.

      The UNHCR Memorandum is also of limited persuasive value

because the court cannot discern its source, its intended recipient or the

date the document was prepared.  In any event, it also corroborates the

court's earlier observation concerning the actual language of the Treaty,

stating:

> Article 31(1) exempts refugees coming directly from a
> country of persecution from being punished on account of their
> illegal entry or presence, provided they present themselves
> without delay to the authorities and show good cause for their
> illegal entry or presence.  In granting this exemption, Article 31
> recognizes, *inter alia*, that departure and entry into host
> countries by irregular means are common methods used by
> refugees fleeing persecution to reach safety.
>       The scope of protection ..., the conditions of entitlement
> ("coming directly", "without delay", "good cause", entry or
> presence without authorization) and the precise nature of
> immunity ("penalties") *are not defined in the 1951 Convention
> and require interpretation* ....

*UNHCR Memo. at 1, Dkt. No. 20,* pt. 4 (emphasis added).  Thereafter, the

Memorandum interprets the Treaty so as to significantly broaden its reach.

*See id.*  Arguably, it is the UNHCR's position that no refugee should be

criminally prosecuted until her asylum status is first administratively or

civilly determined.  *See id.* at 2.  Additionally, the UNHCR has virtually

rewritten portions of the Treaty.  Thus, requirements that asylum seekers

must have come directly from the threatening country, or that they must

present themselves without delay, are interpreted as though they do not

really mean what they say.  Instead, no direct route is required, and

presentation without delay is merely a matter of degree.  *See id.*  Other

than the UNHCR, Malenge has offered no citation to any other authority

supporting her position, and the court has found none.

　　　The court certainly does not intend to impugn the Office of the United

Nations High Commissioner.  After the 1951 Treaty was enacted, the

United Nations General Assembly created the UNHCR to lead and co-

ordinate international action to protect refugees and resolve refugee

problems worldwide.  Its primary purpose is to safeguard the rights and

well-being of refugees.[3]  According to the terms of the Treaty, signatories

_____

　　　[3] *See* UNHCR Website, http://www.unhcr.org/basics.html.

13

agreed that the UNHCR would supervise the application of its provisions. *See* Refugee Treaty art. 2, Nov. 1, 1968, 19 U.S.T. 6223.  However, signatories also agreed that should disputes arise between them, those disputes would be referred to the International Court of Justice if they could not be settled by other means.  *See id.* at art. 4.  Malenge has cited no International Court decisions in support of her position.  Lastly, the Treaty anticipated that signatories would enact laws and regulations ensuring application of the Treaty.  *See id.* at art. 3.  The United States has codified its obligations.  *See* 8 U.S.C. § 1101(a)(17).

Under U.S. immigration statutes, a refugee is a person who is outside her country and is unable or unwilling to return because of persecution or a well-founded fear of persecution on account of her race, religion, nationality, membership in a particular social group, or political opinion. *See* 8 U.S.C. at § 1101(a)(42).  Refugees may seek asylum in this country. *See* 8 U.S.C. § 1158; *see also I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 428 (1987).  In fact, Congress has conformed U.S. law to the 1967 Protocol.  *See, e.g.,* 8 U.S.C. §§ 1521-1522; *Garcia*, 7 F.3d 1320.

When Malenge arrived at Rouses Point, she was deemed to have arrived in the United States, and she was an applicant for admission.  *See*

14

8 U.S.C. § 1225(a)(1).  Therefore, she was required to undergo inspection.
*See* 8 U.S.C. § 1225(a)(3).  During inspection, it was determined that she
was inadmissible because she had, *inter alia*, presented a false passport.
*See* 8 U.S.C. § 1182(a)(7)(A)(i)(I).  At that point, the immigration authorities
had essentially three options: return Malenge to Canada immediately
without further hearing or review, *see* 8 U.S.C. § 1225(b)(1)(A)(i); arrest
and detain her pending a removal decision, *see* 8 U.S.C. § 1226(a); or,
proceed as they did by arresting her for a criminal offense, *see* FED. R.
CRIM. P. 5(b).  Naturally, additional asylum alternatives were available had
they known Malenge was seeking asylum, *see* 8 U.S.C. §§ 1158,
1225(b)(A)(i-ii), but Malenge never told anyone she was doing so.  Even if
the court construed her check mark on the post-arrest pedigree form as an
asylum request, that request never surfaced until after criminal proceedings
had begun.

    When Malenge was detained at the U.S. border for initial inspection
and screening, she could have applied for asylum.  *See* 8 U.S.C. §
1225(b)(1)(A)(ii).  As an unlawful alien present in the United States, she
may still apply for asylum.  *See* 8 U.S.C. § 1158(a)(1).  Even though
criminal proceedings have begun, there is no legal impediment that

precludes an asylum application.  If the facts asserted by Malenge are

sufficiently credible to warrant her justified fear of persecution by

Congolese officials, she has a viable claim, regardless of her current

status.  *See id.*  If she succeeds in satisfying immigration officials that she

meets the statutory definition of refugee because of past persecution, she

may be automatically eligible for asylum.  *See id.* at § 1101(a)(42); *see also*

*Huang v. I.N.S.*, 436 F.3d 89, 94-95 (2d Cir. 2006).  Furthermore, when

officials consider her asylum application, they may not deny it simply

because she used false travel documents.  *See Lin v. Gonzales*, 445 F.3d

127, 133-34 (2d Cir. 2006).  So too, whether a successful asylum

application is precluded because Malenge had firmly resettled in Canada or

some other country is also subject to judicial review.  *See, e.g., Makadji v.*

*Gonzales*, 470 F.3d 450 (2d Cir. 2007).  In short, the court cannot find, nor

has Malenge cited, any authority that supports the relief she seeks,

namely, dismissal of the indictment.  Furthermore, equity does not support

her position.  Her criminal prosecution does not prevent her from seeking

asylum, and despite her concerns, she has cited no authority suggesting

that prosecution will diminish the success of an asylum application.

Ultimately, she must satisfy immigration authorities that she truly fears

16

persecution, and that decision is subject to judicial review.

## IV.  <u>Conclusion</u>

For the reasons stated, it is hereby

**ORDERED** that Linda Adeline Malenge's motion to dismiss the

indictment is **DENIED**, and it is further

**ORDERED** that the Clerk of Court schedule a date within the

parameters of the Speedy Trial Clock by which Linda Adeline Malenge

shall either enter a plea or commence trial.

**SO ORDERED.**

Date:   February 6, 2007
        Albany, New York


_____
Gary L. Sharpe
U.S. District Judge